**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| In re: ) | |
| ) | |
| KEVIN D. CROSS, ) | Case No. 13-10429-BFK |
| ) | |
| Debtor. ) | Chapter 7 |
| ------------------------------------------------------------ ) | |
| ) | |
| ADVANCED COMPUTER CONCEPTS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. Pro. No. 13-01209-BFK |
| ) | |
| KEVIN D. CROSS, ) | |
| ) | |
| Defendant. ) | |

**MOTION FOR SUMMARY JUDGMENT**

Kevin D. Cross ("Defendant" or "Cross"), hereby files this Motion for Summary Judgment ("Motion"), pursuant to Fed. R. Civ. Proc. 56, made applicable by Fed. R. Bankr. Proc. 7056, and moves this Court for the entry of summary judgment in favor of Defendant, and as grounds therefore states that there is no genuine dispute as to any material fact and that Defendant is entitled to judgment as a matter of law. Defendant further states as follows:

**FACTS**

As taken from the Complaint, deposition and discovery responses, the following facts are relevant to this Motion:

1.  Cross and Computer Imaging Concepts were in the business of selling electronics, computer hardware, computer software. Compl., ¶ 8.

**Ronald J. Aiani, Esq. (VSB #32085)**
**Ronald J. Aiani, P.C.**
**86 East Lee Street**
**Warrenton, Virginia 20186**
**(540) 347-5295**
**Counsel to Defendant**

2. ACC sold electronics, computer hardware, computer software and other items to Cross and/or Computer Imaging Concepts on credit. Compl., ¶ 11.

3. By agreement between Cross and ACC, Cross would then sell ACC goods and software to his own customers. ACC would thereafter deliver the goods and software to Cross's customers. ACC would send Cross and/or Computer Imaging Concepts an invoice for the goods purchased. Compl., ¶ 12.

4. Cross sold ACC goods and software to his own customers and received funds in connection with those sales. Compl., ¶ 15.

5. During 2011 and 2012, Cross informed ACC's president, on multiple occasions, that he was not receiving timely payments from his customers. Compl., ¶ 17.

6. In response to Defendant's First Request for Admissions, Plaintiff admitted that Exhibits 1 through 9 of Exhibit A[1] are true and accurate copies of email correspondence between Cross and ACC. See Exhibits A & B.

## ARGUMENT

**I. Summary Judgment is Appropriate Since Plaintiff Bears the Burden of Proof at Trial and the Record Does Not Reflect Evidence Supporting the Essential Elements of Plaintiff's Claim.**

Pursuant to Fed. R. Civ. Pro. Rule 56(a), "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"[T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

---

[1] Exhibits 1 through 9 of Exhibit A, Defendant's First Request for Admissions, are hereinafter referred to as Exhibits A-1 through A-9.

2

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing a motion pursuant to Rule 56, this Court must draw inferences from the underlying facts in the light most favorable to the non-moving party. *See Matsushita Electric Industrial Co. Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 588-589 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

Plaintiff alleges the debt owed to it is nondischaregable pursuant to 11 U.S.C. 523(a)(2)(A), which states, "[A] discharge under section 727 ... does not discharge an individual debtor for any debt ... for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

"[T]o make a debt nondischargeable under §523(a)(2)(A), the plaintiff must prove the following elements:

    (1)    That the debtor made a representation;

    (2)    That at the time the representation was made, the debtor knew the representation was false;

    (3)    That the debtor made the false representation with the intention of deceiving the creditor;

    (4)    That the creditor relied on such representation; and

    (5)    That the creditor sustained the alleged loss and damage as the proximate result of the false representation."

*In re Robinson*, 340 B.R. 316, 344 (Bankr. E.D.Va., 2006) (citations omitted).

"The plaintiff has the burden of proof under § 523 and the plaintiff must prove non-dischargeability by a preponderance of the evidence." *In re Robinson*, 340 B.R. 316, 329 (citations omitted).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In this case, Plaintiff bears the burden of proof of the essential elements of § 523(a)(2)(A) and Plaintiff has failed to make a showing sufficient to establish the existence of each of the essential elements.

The Fourth Circuit Court of Appeals also called attention to an additional burden for the plaintiff under § 523, "When considering the applicability of an exception to discharge, we construe the exception narrowly 'to protect the purpose of providing debtors a fresh start.'" *In re Rountree*, 478 F.3d 215, 219 (4th Cir., 2007) (citing *Foley & Lardner v. Biondo* (*In re Biodno*), 180 F.3d 126, 130 (4th Cir.1999)). "The Supreme Court explained the rationale behind Congress's adoption of the exceptions to discharge in *Local Loan v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). The Court stated that bankruptcy proceedings provide 'a new opportunity in life and a clear field for future effort' to an individual burdened by excessive debt, but it also cautioned that such a new opportunity is available only for the 'honest but unfortunate debtor.'" *In re Rountree*, 478 F.3d 215, 220 (4th Cir., 2007) (citing *Local Loan v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).

At all relevant times in this case, Defendant was open and honest with Plaintiff. See Exhibits A-1 through A-9. Therefore, the exception to discharge in § 523(a)(2)(A) should be

construed narrowly to protect the purpose of providing this honest but unfortunate debtor a fresh start.

For the reasons set forth above, summary judgment is appropriate in this case.

**II.    Plaintiff Fails to Make a Showing Sufficient to Establish that Representations Made by Defendant Were Knowingly False.**

Plaintiff alleges that "Cross continually made false representations to ACC that he was not receiving payments from his customers, which was the cause of his having insufficient funds to pay per their agreement."  Compl., ¶ 23.  Plaintiff further alleges that the true reason Defendant did not have sufficient funds to pay ACC was that "Cross was using the funds he received from his customers for his personal living expenses."  Compl., ¶ 25.

"[P]laintiffs must prove the debtor knew or should have known the representation was false when made." *In re Robinson*, 340 B.R. 316, 347 (Bankr. E.D.Va., 2006) (citations omitted).

At all relevant times, Cross was open and honest with ACC regarding his financial situation.  As early as August 2011, Cross informed ACC that he was having difficulty getting payments from customers.  See Exhibit A-1.  In September 2011, Cross communicated to ACC that he was "in the process of trying to increase my line of credit with my bank due to a cash flow issue."  See Exhibit A-3.  Plaintiff has produced no evidence showing these representations were false.

Assuming *arguendo* that Cross was using funds received from customers to pay for living expenses, Cross never represented that he did not use such funds for living expenses.  While late payments from customers such as TNS and Xerox were partly to blame for Cross's inability to pay ACC on time, Cross also acknowledged that his personal financial mismanagement was the main culprit of his financial woes.  See Exhibit A-4; Exhibit C, page 15.  In the Rule 2004

examination, Cross stated the reasons for his deteriorating financial position, "Bad decisions with housing.... Loans ... at one point were manageable but no longer because my income was going down ... the bills kept getting higher and the income kept going lower ..." Exhibit C, page 15.

In an email from Cross to ACC dated December 15, 2011, Cross told ACC, "I am sorry that my mismanagement has strained our relationship. I want to stress that it is my cash mismanagement that is the primary reason for this situation. I am doing everything in my power to correct the situation." See Exhibit A-4. Viewing these facts in the light most favorable to ACC, there is no indication and no inference to be made that Cross knowingly lied or made false representations regarding Cross's inability to pay ACC on time.

In fact, Cross made partial payment to ACC during the relevant time period. See Exhibit A-4; Exhibit C, pp. 60-61. During the Rule 2004 examination, counsel for Plaintiff went over an Aging Report from ACC and the corresponding invoices. Exhibit C, pages 60-63. Cross was able to pay approximately $63,000 of one outstanding invoice. Exhibit C, page 63. Earlier in the examination, Cross testified that when payments came in, he "would pay [ACC] what [he] could." Exhibit C, page 16. The evidence in the record clearly shows Cross's willingness to work with ACC to solve the financial problems between the two parties. ACC fails to point to a specific instance of a false representation made by Cross other than the bare bones allegations contained in the Complaint.

Moreover, Debtor's Interrogatory No. 3 asked ACC to "Please state the factual basis, in detail, of your allegation as stated in paragraph 16 of the Complaint, that Defendant 'continually made false representations to ACC....'" See Exhibit D. ACC could not state any factual basis that tends to show that Debtor made false representations to ACC. Instead, ACC responded generally by referring to the exhibits attached to Defendant's Requests for Admission and the

173 pages of documents produced in response to Production Requests Nos. 5, 10, 12, 13, and 14. See Exhibit E.

Finally, Debtor's Interrogatory No. 8 asked ACC "If you believe that Defendant knowingly made false representations to ACC, please state (1) when you believe Defendant made those false representations; (2) the specific false representations yo [sic] believe were knowingly made...." See Exhibit D.  ACC could not state any facts that tends to show that Debtor knowingly made false representations to ACC.  Instead, ACC again responded generally by referring to the exhibits attached to Defendant's Requests for Admission and the 173 pages of documents produced in response to Production Requests Nos. 5, 10, 12, 13, and 14. See  Exhibit E.

For the reasons set forth above, this Motion for Summary Judgment must be granted.

### III. Plaintiff Fails to Make a Showing Sufficient to Establish that Defendant Intended to Deceive Plaintiff.

"[T]o make a debt nondischargeable under § 523(a)(2)(A), the plaintiff must prove ... [t]hat the debtor made the false representation with the intention of deceiving the creditor." *In re Robinson*, 340 B.R. 316, 344 (Bankr. E.D.Va., 2006) (citations omitted)  "'Because direct proof of intent (i.e. the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred.'" *In re Robinson*, 340 B.R. 316, 347 (Bankr. E.D.Va., 2006) (citations omitted).

The evidence in the record shows Cross's willingness and eagerness to pay the debt owed by him to ACC.  In an email dated September 7, 2011, Cross told ACC that he had a meeting with the Senior Director of Purchasing of TNS (one of Defendant's most problematic customers) to discuss how to get paid faster.  See Exhibit A-2.  On September 30, 2011, Cross informed ACC that he was in the process of trying to increase his line of credit with the bank to help with

7

his cash flow issue. See Exhibit A-3. In that same email, Cross offered to pay late charges and fees associated with paying by credit card. See Exhibit A-3.

During the relevant time period, Cross made partial payment to ACC in an effort to keep the business going and eventually pay ACC in full. See Exhibit A-4; Exhibit C, pages 15-16. When Cross made a good faith attempt to get an increased line of credit from Sonabank, Sonabank turned on Cross by adding a new condition that all advances must be approved by the bank prior to disbursement of funds. See Exhibit A-9. Further, Cross informed ACC of Sonabank's response the day after he received it. See Exhibit A-9. In response to the bank's roadblock, Cross suggested he and ACC would have to "get creative and do some deals around the bank to get it done." See Exhibit A-9. Cross even offered to work for ACC to work off the debt. See Exhibit A-9.

Finally, Debtor's Interrogatory No. 7 asked ACC to "Please state the legal and factual basis, in detail, upon which you believe Defendant intended to deceive ACC." See Exhibit D. ACC could not state any factual or legal basis that tends to show that Debtor intended to deceive ACC. Instead, ACC once again responded generally by referring to 173 pages of documents produced in response to Production Requests Nos. 5, 10, 12, 13, and 14. See Exhibit E.

As shown above, the evidence only shows Cross being open and honest with ACC at all times. There is no inference to be drawn that Cross intended to deceive ACC in any way. Cross offered several solutions, including paying ACC by credit card, approaching the bank to increase credit in order to pay ACC, and settling the debt by Cross doing work directly for ACC. See Exhibits A-1 through A-9. None of this evidence indicates any intent on the part of Cross to deceive ACC. Throughout this business relationship, Cross continually updated ACC on his status with troublesome customers and his bank. In the absence of evidence indicating an intent to deceive, Plaintiff's claim cannot stand.

For the reasons set forth above, this Motion for Summary Judgment must be granted.

IV.     **Plaintiff Fails to Make a Showing Sufficient to Establish that Plaintiff Relied on Defendant's Representations.**

"[A] plaintiff must prove he justifiably relied on debtor's representations in order to succeed under §523(a)(2)(A)." *In re Robinson*, 340 B.R. 316, 348 (Bankr. E.D.Va., 2006) (citing *Field v. Mans* (*In re Field*), 516 U.S. 59, 73-74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)). "'Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.'" *In re Robinson*, 340 B.R. 316, 348 (Bankr. E.D.Va., 2006) (citing *Field v. Mans* (*In re Field*), 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)).

A.      **Plaintiff Fails to Make a Showing Sufficient to Establish that Plaintiff Justifiably Relied on Defendant's Representations.**

"[Creditor's] disregard of the 'red flags,' dictates that [creditor's] reliance on [debtor] was not justified." *In re Robinson*, 340 B.R. 316, 349 (Bankr. E.D.Va., 2006) (citing *Giovanni v. Grayson, Kubli & Hoffman, P.C.* (*In re Giovanni*), 324 B.R. 586, 594 (E.D.Va.2005) (citing *In re Anastas*, 94 F.3d 1280, 1286 (9th Cir.1996)) (stating ... "disregard of 'red flags' falls below the justifiable-reliance standard'")). In *In re Robinson*, the court found that even if debtor knew of the inaccuracy of the bills it paid to creditor, creditor was not justified in relying on debtor's payments as evidence of the accuracy of the bill. *In re Robinson*, 340 B.R. 316, 349 (Bankr. E.D.Va., 2006). The court reasoned that persistence of zero-usage meter readings should have been "red flags" because the extended length of time the meter continued to show zero usage after debtor occupied the building. *Id*.

In the present case, there is no dispute regarding the fact that ACC had similar "red flags." As early as August 2011, ACC was aware of Cross's problems paying. See Exhibit A-1.

9

The "red flags" continued to pop up through the next 8 months, and ACC continued to do business with Cross. See Exhibits A-1 through A-9.

On September 7, 2011, Cross emailed ACC stating, "I have a meeting scheduled with the Senior director of Purchasing [of TNS] next week to discuss how we can get paid faster. ... By no means do we want to lose this customer, however they are paying slower than Xerox most of the time now." See Exhibit A-2.

In an email dated September, 30, 2011, Cross stated, "With that money tied up and delays in manufacturing, plus my two largest accounts paying in around 60 days +, it has made an impact on my cash flow." See Exhibit A-3.

In October 2011, ACC was still quoting prices to Cross despite Cross's problems with paying on time. On October 25, 2011, Cross offers to put a customer's order on his credit card in order to keep money flowing to ACC. See Exhibit A-6.

In an email exchange on December 15, 2011, Cross explains that there are more problems with payments from customers, but, significantly, adds, "I am sorry that my mismanagement has strained our relationship. I want to stress that it is my cash mismanagement that is the primary reason for this situation." See Exhibit A-4. This email shows that late payment by customers was not the only reason for Cross's delayed payments to ACC. Cross explicitly told ACC that his personal cash mismanagement was the primary reason for his poor financial condition. See Exhibits A-4 and A-7.

On April 23, 2012, Cross tells ACC, "I am getting as much [money] as I can together to either a. mail out before Thursday, or b. bring with me on Thursday." See Exhibit A-5.

In addition, ACC had its own Aging Reports showing Cross's problems paying on time. See Exhibits A-1 through A-4, A-7. The Aging Reports contained in the exhibits show invoices

from ACC to Cross going from less than 30 days unpaid to 30-60 days unpaid to 60-90 days unpaid to over 90 days unpaid. See Exhibits A-1 through A-4, A-7.

Despite all these "red flags," ACC continued to do business with Cross. As late as May 2012, ACC is still quoting prices for goods to Cross. See Exhibit A-7. By continuing to do business with Cross, ACC disregarded the red flags and, thus, ACC fell below the justifiable-reliance standard as stated in *In re Robinson*, 340 B.R. 316, 349 (Bankr. E.D.Va., 2006) (citations omitted).

"'[P]laintiff is required to exercise some judgment.'" *In re Robinson*, 340 B.R. 316, 348 (Bankr. E.D.Va., 2006) (citing *Guar. Residential Lending, Inc. V. Koep* (*In re Koep*), 334 B.R. 364, 372 (Bankr. D.Md.2005) (quoting *Boyd v. Loignon* (*In re Loignon*), 308 B.R. 243, 249 (Bankr. M.D.N.C.2004))). "[A] creditor is 'required to use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him.'" *In re Robinson*, 340 B.R. 316, 349 (Bankr. E.D.Va., 2006) (citing *Field v. Mans* (*In re Field*), 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (quoting Restatement (Second) of Torts § 541 (1996)).

By continuing to rely on Cross's representations that he was waiting for customer payment and that he was doing everything he could to pay ACC, ACC failed to exercise appropriate judgment regarding the deteriorating business relationship. While this may have been bad business, there is nothing to suggest that ACC was justified in blindly relying on Cross's representations for such an extended period of time.

ACC has not put forth any evidence that it was justified in relying on Cross's representations regarding payment to ACC. ACC disregarded repeated red flags regarding Cross's increasingly difficult financial position.

### B.  Plaintiff Fails to Make a Showing Sufficient to Establish that Plaintiff Actually Relied on Defendant's Representations.

In addition to justifiable reliance, the Supreme Court stated in *Field* that §523(a)(2)(A) also requires actual reliance. *Field v. Mans* (*In re Field*), 516 U.S. 59, 70 (1995). "The operative terms ... 'false pretenses, a false representation, or actual fraud,' carry the acquired meaning of terms of art. ... [T]hey imply elements that the common law has defined them to include." *Field v. Mans* (*In re Field*), 516 U.S. 59, 69 (1995). "The section [of the Restatement (Second) of Torts (1976)] on point dealing with fraudulent misrepresentation states that both actual and 'justifiable' reliance are required." *Id*. at 70. "As for the reasonableness of the reliance, our reading of the Act does not leave reasonableness irrelevant, for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact.... [R]easonableness goes to the probability of actual reliance." *Id*. at 76.

ACC has no evidentiary basis for the reasonableness of any purported actual reliance on Cross's representations. ACC's purported actual reliance was not reasonable because ACC knew of Cross's financial problems as early as August 2011 and continued to rely on Cross's representations until at least May 2012. See Exhibits A-1 through A-9. In this instance, the distance between ACC's alleged actual reliance and the limits of what is reasonable is too far. There is no evidence to support the allegation that ACC actually relied on Cross's representations with regard to the standard set out in *Field v. Mans* (*In re Field*), 516 U.S. 59, 69-70, 76 (1995).

For the reasons set forth above, this Motion for Summary Judgment must be granted.

### V.  Plaintiff Fails to Make a Showing Sufficient to Establish that Plaintiff Sustained the Alleged Loss and Damage as the Proximate Result of Defendant's Representations.

Plaintiff alleges that "As a result of the misrepresentations made by Cross and the illegal conversion of monies by Cross, ACC has been damaged and continued to be damages in the

amount of no less than $163.634.53." Compl., ¶ 31.

"[T]o make a debt nondischargeable under §523(a)(2)(A), the plaintiff must prove ... [t]hat the creditor sustained the alleged loss and damage as the proximate result of the false representation." *In re Robinson*, 340 B.R. 316, 344 (Bankr. E.D.Va., 2006) (citations omitted).

"Proximate cause is both (1) causation in fact[,] 'loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;' and (2) legal causation, 'if the loss might reasonably be expected to occur from the reliance.'" *In re Robinson*, 340 B.R. 316, 350 (Bankr. E.D.Va., 2006) (quoting Restatement (Second) of Torts §§ 546, 548A; *see also In re Britton*, 950 F.2d 602, 604 (9th Cir.1991); *In re Grant*, 237 B.R. 97, 117 (Bankr. E.D.Va.1999); *Shannon v. Russell* (*In re Russell*), 203 B.R. 303, 313 (Bankr.S.D.Cal.1996)).

Plaintiff produced no evidence showing representations made by Cross were the actual cause or the legal cause of ACC's alleged damages. ACC's willingness to continue to do business with Cross, despite numerous and repeated red flags, was the cause of ACC's alleged damages.

For the reasons set forth above, this Motion for Summary Judgment must be granted.

## CONCLUSION

After adequate time for discovery, Plaintiff has failed to make a showing sufficient to establish the essential elements of § 523(a)(2)(A). For the reasons stated above, this Motion for Summary Judgment must be granted.

13

WHEREFORE, Defendant respectfully requests that this motion for summary judgment be granted; and for such other and further relief as may be just and necessary.

                    Respectfully submitted,

                    KEVIN D. CROSS
                    By counsel

/s/ Ronald J. Aiani
Ronald J. Aiani, Esquire (VSB #32085)
Ronald J. Aiani, P.C.
86 East Lee Street
Warrenton, VA 20186
(540) 347-5295

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was mailed first-class, postage prepaid, on this 25th day of March, 2014 to the following:

    George LeRoy Moran, Esq.
    Moran Monfort, P.L.C.
    4041 University Dr., Suite 301
    Fairfax, VA 22030-3410

    Office of U.S. Trustee
    115 So. Union Street, Suite 210
    Alexandria, VA 22314

                    /s/ Ronald J. Aiani
                    Ronald J. Aiani